## Case No. 8,354.

### The LINCOLN.

[1 Lowell, 46.] [1]

District Court, D. Massachusetts. Jan., 1866.

COLLISION—VESSEL AT ANCHOR — PRESUMPTION— PRUDENT AND SAFE POSITION—WATCH.

1. When one vessel drives upon another, which is at anchor in a proper position, the presumption is that the former is in fault.
[Cited in The Echo, 19 Fed. 454.]

2. It cannot be affirmed, as matter of law, that a vessel, coming to anchor in a harbor, is only obliged to swing clear of other vessels already anchored there. She is bound, if possible, to take up such a position as is prudent and safe under all the circumstances.

3. Where a brig was brought to anchor in the daytime, when the wind was blowing heavily and seemed likely to increase, ten fathoms astern of one schooner, and twenty fathoms ahead of another, and had out, when so anchored, only half the scope of her chains, and, during the night, the schooner ahead fouled the brig, which dragged on the schooner astern: Held, the brig was responsible to the latter schooner, whether she was at all in fault for the first collision or not, because she was anchored too near the schooner astern.

4. Semble, she was too near the other schooner also.

5. The injured schooner should have had an anchor watch: but as the neglect to keep one did not contribute to the collision, she was decreed to recover her whole damage.

In admiralty.

H. A. Scudder, for libellants.
J. C. Dodge, for respondents

LOWELL, District Judge. This is a cause of collision promoted by the owners of the Annie Magee, a schooner of two hundred and twenty tons burden, against the Lincoln, a brig of one hundred and ninety tons, for the consequences of a collision which occurred in the harbor of Boston on the night of the second of November, 1861. The pleadings were filed, and some of the evidence was taken soon after the event happened; but the hearing was, for some reason, not brought on until lately.

The libellants' schooner, having discharged a cargo of coal in Boston, took up her anchorage towards noon, on the edge of the flats, from half a mile to a mile to the southward and eastward of Long wharf, and about half way between two schooners already lying there, of which the only one we are concerned with in this case, the Eliza & Rebecca, was directly to windward. The wind was blowing fresh from the east-south-east, and seemed likely, as all the witnesses say, to increase. It did, in fact, increase during the afternoon, and some part of the night, until it was blowing very heavily.

An hour or two after the schooner came to anchor, the brig, with a load of coal on

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

board, was towed down from a comparatively insecure position near Rowe's wharf, and anchored between the Eliza & Rebecca and the Annie Magee directly to leeward of the one and to windward of the other, or very nearly so. Towards nine o'clock in the evening the Eliza & Rebecca and the brig were in collision, and the port anchor of the latter was lost, and presently after she drove down afoul of the Annie Magee and carried away her jib-boom, and was cleared and brought up nearly abreast of her. When the tide turned ebb, some hours later, the brig again fouled the schooner by swinging against her stern. So far the facts are clear.

The brig, then, having driven upon a vessel at anchor, a primâ facie case is made out against her, and, to exonerate herself it will not be enough to show a recent collision by which she was rendered unmanageable, unless it appears that she was without fault in that collision; and, besides, that the second collision was a necessary consequence of the first, and not caused in whole or in part by her fault or negligence co-operating with her first and innocent collision. The Annapolis, 5 Law T. (N. S.) 326, 1 Lush. 376, note; The Egyptian, 8 Law T. (N. S.) 776; Seccombe v. Wood, 2 Moody & R. 290; The Christiana, 7 Notes Cas. 2; 7 Moore, P. C. 160. See The Louisiana, 3 Wall. [70 U. S.] 164.

In this case the claimants say that the collision, now in question, was caused solely by the earlier one with the Eliza & Rebecca, which was itself caused either by the negligence of the Eliza & Rebecca, or by the violence of the gale, and that, in either view, no fault can be imputed to the brig; and, finally, that the Annie Magee either caused or contributed to the misfortune by her negligence in not keeping an anchor watch. The libellants, on the other hand, allege that the brig was anchored dangerously near to both schooners, and is, therefore, responsible in this suit, whether the Eliza & Rebecca were in any fault or not; but that, in fact, she was not in any fault in the first collision, nor was their schooner in the second.

No vis major is proved. The gale does not appear to have been such as to drive a well-moored vessel from her anchors. We hear of no other disasters from drifting. All of the vessels whose history for that evening is given in evidence, were riding securely, most of the time, at single anchors. Whether the Eliza & Rebecca dragged or not is in controversy; but if she did, it was only for a very short distance, and she was brought up instantly upon her second anchor being thrown over. The brig had but one anchor after the collision; and she appears to have been held by it; while, therefore, the wind was so strong as to be called a gale by several of the witnesses, it does not seem to have been of such great violence that no further cause need be sought for this misfortune.

To the contention of the libellants, that the brig was anchored too near the schooners, it is answered, by the claimants, in the first place, that, as matter of law, a vessel coming to anchor in a harbor, is bound only to swing clear of other vessels, and that, if she does this, she is at a proper distance, and is not responsible for the dragging of her own anchors or those of other vessels, which is said to be one of the necessary risks of navigation, like those which arise from sailing on a dark night, or in a fog. No authorities were cited for this position, and I have found none. The rule of law I take to be, that vessels must be navigated with all reasonable precaution against the happening of accidents, and with all reasonable preparation to extenuate the consequences of accidents, when they occur, and, amongst others, against dragging. It is on this principle, that a vessel which had been well and carefully anchored, and was driven from her anchors in a very severe gale, and forced against another vessel, was held liable for the damage, upon proof that she had been left with no person on board during a night when the gale, which occurred, was evidently threatened. And this, not because any precaution would have prevented her striking adrift, but that the crew, if on board, might perhaps, by prompt action, have prevented its injurious results to the libellants' vessel; Clapp v. Young [Case No. 2,786].

And so are the following authorities: In the case of The Volcano, 2 W. Rob. Adm. 337, Dr. Lushington, with the advice of the trinity masters, pronounced a steamer to be negligently moored because she had taken her berth at two cables' lengths or two hundred and forty fathoms, to windward of the injured vessel. In another case, very like the present, the trinity master pronounced it bad seamanship to anchor so near to another vessel, directly ahead or directly astern, that in case of striking adrift there would not be room to bring up or shear the drifting ship without danger of collision; and such was the opinion, he said, of the writers on navigation. And the damage was pronounced for, although the immediate cause of the drifting was the breaking of a chain cable, concerning which the owners were not proved to be in any fault. The Cumberland, Stu. Adm. 75. In a case before Judge Sprague it was held that one hundred and twenty-five fathoms directly to leeward was ample distance under the circumstances, and upon the nautical testimony of that case; and his judgment seems to imply that something more than swinging clear was required, although there was nothing like a gale existing or threatened. And the whole examination was conducted on the assumption that room enough must be given for the windward vessel to get under weigh. The Julia M. Hallock [Case No. 7,579].

No doubt this is in large part a question

of seamanship; and if it were shown that the chance of dragging was so slight as to be practically disregarded by prudent and skilful navigators, the court might well hold that the precautions ordinarily adopted by such men under like circumstances would be sufficient in a given case. But the evidence does not go to that extent. The attention of the experts, in the case at bar, was chiefly directed to this question of distance, as applied to the relative positions of the brig and the Eliza & Rebecca. And I think it is the fair result of their testimony that, under the circumstances of night, and a heavy blow approaching, they would consider it more prudent to take up a greater distance, if possible, from a vessel already anchored to windward of them, than that of ten fathoms, assumed by the libellants to have been the distance at which the anchor was dropped by the brig to the leeward of the Eliza & Rebecca. It is true that some of these gentlemen seem to think that as they would be in the leeward vessel and the risk would be chiefly theirs, they would be justified in choosing that position though unsafe; but it is not easy to see how they could rightfully assume any risk for themselves without at the same time undertaking it for all others whose interests might prove to be involved by their imprudence; and that is the very question here. Their evidence therefore appears to confirm the decisions, and to look to the question of prudence under all the circumstances as the test, and not merely swinging clear. So far as the fact of distance is concerned, I am entirely satisfied that the brig did drop her anchor at not far from ten fathoms astern of the windward schooner. (The judge here stated the evidence on this point.) It seems to me, therefore, that the brig was anchored imprudently near to the Eliza & Rebecca, and is therefore liable for the consequences to the libellants' vessel of the first collision, whether the Eliza & Rebecca were to blame in that matter or not; concerning which it becomes unnecessary to inquire.

It is still more plain that the brig was too near the libellants' schooner, and it is upon this part of the case that I chiefly rest my judgment, though I have considered the other very fully because it was fully argued and rests upon the same grounds of law. After careful examination of all the testimony, I am convinced that the mate of the brig, who anchored her, and whose deposition, as already stated, was taken soon after the collision, and who on this point agrees substantially with the libellants' witnesses, allows all the distance the facts would warrant in his statement, that when he went ashore for the night, the vessels were about twenty fathoms apart. And I understand this estimate to refer to the hulls of the vessels, as it naturally would, and in which sense I accept it as tolerably accurate; and of course the stern of the brig

would be several fathoms nearer than this to the jib-boom of the schooner. Taking next the evidence of the respondents' witnesses, which are the most favorable to them in this particular, the brig had over not more than thirty fathoms of chain at this or at any time. It follows that she could not have given her anchors their full scope, if occasion should demand it, without fouling the schooner; for that scope was sixty fathoms. It follows again that the brig did not swing clear of the schooner, if by that is meant that she would clear her when the brig had her full play of cable. And I should not readily decide that it is either the law or usage of the sea to require when a gale is approaching that the anchoring vessel should swing clear of others with only so much chain as may happen to be needed at the moment of anchoring, without allowance for further scope, and I do not see that that allowance can well be less than the whole of her supply.

My judgment upon this point is strongly confirmed by the fact that our coasters usually come to anchor by one anchor only, and expect to use the other when occasion may require; but this necessity may be developed suddenly, and in many instances is known only by the dragging of the first anchor, and it is obviously necessary to have some sea-room to bring up a drifting vessel, and although it is a question of skill in each case how much should be allowed, extending, it appears, to two hundred and forty fathoms in one instance, and being less than one hundred and twenty-five in another; yet I cannot think, as I have said, that it can ever be less than the full scope of the vessel's chains.

The evidence discloses a considerable probability, at least, that the accident here was substantially what I have last supposed, and that the only anchor which really held the vessel was carried away, and that she was brought up as soon as the second and larger anchor took firm hold of the ground. (The judge considered the evidence of this.)

I am therefore of opinion that the brig was anchored imprudently near to both schooners, and especially to that of the libellants, and is responsible for this damage in whole, or in part; for the evidence is full to there being ample room in the harbor that afternoon for the brig to have taken up a safer position.

The only remaining question is whether the Annie Magee is likewise in fault. She had no anchor watch; and the preponderance of the nautical evidence is that she was bound to have one under such circumstances, and I should have no doubt of it without evidence. If, therefore, I could see any reason to believe that the collision might have been avoided by any exertions or manoeuvres which a wakeful crew upon the schooner could have adopted, I should require the losses to be divided. But the testimony is

very clear that she could have done nothing. The brig was in much better condition to shear, because she was loaded and took more hold of the water, but she could not avoid the Eliza & Rebecca, though discovered at a distance which was probably equal to that between these two vessels. And there has been no evidence which has any tendency to show that this fault on the part of the libellants can have contributed, in any way, to the disaster. I must therefore pronounce for the whole damage. Damage pronounced for.